AO 91 (Rev. 01/09) Criminal Complaint

# UNITED STATES DISTRICT COURT

### for the
### Southern District of Ohio

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No. |
| HAIDER ZAFAR | ) | |
| | ) | |
| *Defendant* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of ___01/04/2008___ in the county of ___Delaware___ in the ___Southern___ District of
___Ohio___ , the defendant violated ___18___ U. S. C. § ___1343___ , an offense described as follows:

Fraud by Wire, Radio, or Television

This criminal complaint is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Charles T. Birch, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___05/26/2013___

_____
*Judge's signature*

City and state: ___Columbus, OH___

Norah McCann King, U.S. Magistrate Judg
*Printed name and title*

I, Kenneth G. Beebe, have been duly sworn, depose and state:

## I. BACKGROUND AND QUALIFICATIONS OF AFFIANT

1. I am a Special Agent for the Internal Revenue Service – Criminal Investigation (hereafter IRS-CI), United States Department of the Treasury, assigned to the Columbus Post of Duty of the Cincinnati Field Office. I have been employed as a special agent since September 11, 2009 and my current duties include the investigation of federal crimes, including money laundering and criminal tax violations. As a special agent of the IRS-CI, I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7). As such, I am empowered to conduct investigations of and make arrests for offenses enumerated in Title 18, United States Code, Section 2516. I graduated from the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia in December 2009. I graduated from the Special Agent Investigative Techniques programs at the National Criminal Investigation Training Academy in March 2010. I have studied a variety of law enforcement, criminal investigator, and tax crime issues, including search and seizure, violations of the Internal Revenue laws and Internal Revenue Service procedures and policies in criminal investigations. I earned a Bachelors Degree in Business Administration from Central Michigan University in May of 2002 and a Masters of Science in Accountancy from Walsh College in September 2004. I received my Certified Public Accountant license in October 2006.

## II. PROPERTY TO BE SEARCHED

2. The properties to be searched are as follows:
   (a)   8195 Avery Road, Dublin, OH 43017 (the known residence of Haider and Cindy Zafar;
   (b)   957 Maketewah Drive, Delaware, OH 43015 (the known residence of Jacob and Margaret Johnson.
All of which are more fully described in Attachment A.

## III. PROPERTY TO BE SEIZED

3. Fruits, evidence, and instrumentalities of the following offenses: 18 U.S.C. §§ 1343, 1956(a), 1957, and 26 U.S.C. §§ 7201, 7203, and 7206, as more fully described in Attachment B.

## IV. OUTLINE/BACKGROUND

4. This investigation originated from information provided by a cooperating witness (CW). The CW claimed HAIDER ZAFAR (ZAFAR) was purchasing luxury vehicles over $100,000 from local Columbus area car dealerships. The CW said Mercedes Benz Financial (MB) believed ZAFAR was either a drug dealer or had access to non-legitimate income and turned down his credit. After MB turned down ZAFAR for credit, ZAFAR paid for the vehicles with large sums of cash in certified funds.

5. In December 2007, ZAFAR devised a real estate investment scheme to obtain money under false pretenses and representation and targeted one investor, Patwinder Sidhu (Sidhu). Beginning in January 2008 through February 2010, ZAFAR received approximately $10 million from Sidhu. ZAFAR solicited the funds for real estate ventures in Pakistan using questionable papers including letters issued under the name of a Pakistani government official, Chaudhry Mukhtar (Mukhtar). ZAFAR told Sidhu that Mukhtar is his, ZAFAR's, direct uncle and the Defence Minister of Pakistan. Mukhtar was in charge of buying property in Pakistan for the government. ZAFAR told Sidhu that Mukhtar will tell ZAFAR what land the government wants to buy and then ZAFAR and Sidhu will buy the land before the government does and then sell it to the government for a profit. ZAFAR emailed the documents to Sidhu and received the investment funds through several multi-million dollar wire transfers, ranging from $20K - $300K per wire. Monies were transferred from Sidhu, his friends and family members various bank accounts into one Chase bank account located in Columbus, Ohio, account number 751913088. The transfers were initiated from several banks, all located outside the state of Ohio. The majority of the bank accounts are located in the Potomac, Maryland area and the Washington DC area. All transfers were fedwire transfers and occurred by the direction of ZAFAR.

6. ZAFAR told the investor the real estate deals were successfully completed but has offered various false explanations as to why the investor has not received any share of the profits. ZAFAR made the excuse that his name is on the OFAC (Office of Foreign Asset Controls) list. This affiant contacted OFAC and a representative reviewed the lists for 2007 – 2010. ZAFAR's name was not on the list. ZAFAR claimed his uncle was the Prime Minister of Defence in Pakistan and emailed Sidhu and his friends signed documents from his uncle. These documents appear to be fraudulent. No relation between ZAFAR and the Prime Minister of Defence appears to exist. Furthermore, ZAFAR lied to banking officials and claimed the transfers were profits from a domestic night club.

7. ZAFAR used the proceeds from the fraudulent investment scheme to purchase luxury items. These proceeds were concealed in a Chase

[2]

bank account (#751913088), under a nominee name. The main account holder was Jacob R. Johnson, ZAFAR's father-in-law. Johnson told bank officials that ZAFAR controls this account. The luxury items were purchased using direct checks or debit card transactions from the Chase account (#751913088) or with credit cards. The credit cards were also in the name of Johnson, with ZAFAR being an authorized user. All of the payments to the credit cards were direct withdraws/transfers from the Chase bank account (#751913088). ZAFAR purchased luxury vehicles including a Lamborghini, a Phantom, and Mercedes Benz's. ZAFAR also used the proceeds to purchase high end jewelry from a company called Diamond Cellar. All invoices from Diamond Cellar were obtained by this affiant. A total of 26 pieces of jewelry were purchased, totaling over $200K. The items included a $35,000 diamond and several watches, one priced at $42,000.

8. IRS records indicate that ZAFAR has not reported any income to the IRS for the past four tax years. He did not file any tax returns for tax years 2008 and 2009. ZAFAR filed belated "zero" returns (meaning all line items were answered with a $0) for tax years 2006 and 2007 in November 2009. Bank deposit information, lifestyle evidence, and ZAFAR's admissions indicate that ZAFAR has substantial unreported income for each of these tax years. As detailed below, ZAFAR claims he makes $1 million a year from his numerous successful foreign and domestic businesses. Bank records and witness statements suggest ZAFAR is operating through nominee bank accounts. Those accounts received $13.8 million in deposits from May 2007 through July 2010. ZAFAR has purchased numerous luxury vehicles.

9. The facts and conclusions set forth in this affidavit are based on my knowledge, training and experience, that of senior agents with whom I have conferred, bank records, tax records, public records, witness interviews, trash pulls and surveillance. Based on the information detailed below, I submit that there is probable cause to believe HAIDER ZAFAR has committed the following offenses and that fruits, evidence and instrumentalities of said crimes will be found at the locations to be searched:

    (a)   18 U.S.C. 1343: Wire Fraud;

    (b)   18 U.S.C. 1956(a)(1)(B)(i): Money Laundering;

    (c)   18 U.S.C. §1957: Transactional Money Laundering;

    (d)   26 U.S.C. §7201: Tax Evasion;

[3]

    (e)    <u>26 U.S.C. §7203:</u> Failure to File Tax Returns;

    (f)    <u>26 U.S.C. §7206:</u> False Tax Returns

10. I submit that there probable cause to believe ZAFAR has committed one or more of these offenses by:

    (a)    Sending false information via email in an effort to solicit investors for a real estate scheme;

    (b)    Receiving domestic wire transfers under fraudulent and false pretenses, representations, or promises;

    (c)    Knowingly conducting financial transaction involving wire fraud proceeds through nominee bank accounts with the intent to conceal or disguise the nature, location, source, ownership, or control of property;

    (d)    Knowingly engaging in monetary transactions in excess of $10,000 with wire fraud proceeds;

    (e)    Willfully failing to report business and personal income derived from businesses under ZAFAR's ownership, direction, and control;

    (f)    Willfully attempting to evade the assessment and/or collection of taxes;

    (g)    Willfully failing to file personal federal income tax returns; and

    (h)    Willfully making and subscribing false personal federal income tax returns for tax years 2006 and 2007.

11. ZAFAR is of Pakistani decent. According to US Immigration and Customs Enforcement (ICE), ZAFAR is not a naturalized citizen. ZAFAR has a lawful permit/alien card for the United States. ZAFAR also has the following variations of his name: Haider ZAFAR Khan Kanju or Syed Haider ZAFAR Kanju Siddique Shah or Haider ZAFAR. ZAFAR is also known to go by "Chip." Natori King is the daughter of ZAFAR's wife, Cynthia, from her previous marriage. Rafee ZAFAR is ZAFAR's son.

## V. AGENT EXPERIENCE

[4]

12. Based on my training, experience and knowledge, as well as that of senior CID agents with whom I have conferred, I know:

    (a)    That businesses often maintain safes on the premises in which cash, receipts, and other records are often kept in the ordinary course of business;

    (b)    That business owners often summarize information obtained from day to day business records into financial documents such as income and expense statements, gross receipts journals, expenditure journals, payroll journals, and general ledgers;

    (c)    That individuals typically maintain records that detail income they earned from businesses they own, control, or direct, for several years;

    (d)    That individuals maintain books and records at their home, business location, and/or the location from which they direct their business;

    (e)    That it is common practice among individuals to maintain journals, bank records, and other financial records reflecting assets, liabilities, income and expenditures;

    (f)    That by reviewing bank and business records, the flow of funds to or from an individual or business can be identified by tracing the "paper trail," which is created by entries into business records, bank account records, invoices, receipts, or other documents created to initiate and finalize transactions, as well as work-papers, schedules, ledgers, and journals used to record the results of financial transactions;

    (g)    That records of individuals and businesses are used as a basis for the preparation of individual, corporate, and business income tax returns;

    (h)    That personal financial and business records are ordinarily kept and maintained at an individual's home and place of business for extended periods of time, often several years;

    (i)    In the current age, most records are typically kept on computer and that computers are likely to be on the premises;

    (j)    That it is frequently impossible to directly prove the income of people who have engaged in a pattern of financially deceptive

[5]

or unrecorded transactions. In those cases, the Service must resort to a net worth or other indirect analysis. To perform that analysis, it is necessary to have the records for a base year immediately preceding the first year in which suspect activities have been identified;

(k)     That a taxpayer's motor vehicles typically contain asset ownership and expenditure records which are necessary to recreate a taxpayer's income and tax liabilities through an indirect method of proof. Such records include registrations, insurance documents, license fees and receipts documenting maintenance and repair expenses.

(l)     That cell phones and personal digital assistants often contain contact information and/or text communications between businesses and their clients/suppliers/investors; and between co-conspirators.

(m)     That tax evaders and/or money launderers will often use nominee bank accounts and/or place assets in nominee names in order to conceal their income from the IRS and the nature, source and location of the same from legal authorities.

## VI. COMPUTERS

13. Based on your affiant's knowledge, training, and experience, as well as that of agents trained in computer forensics with whom I have conferred, I know that

(a)     Computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space - that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space - for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that

[6]

have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

(b)    Computer data can be stored on a variety of systems and storage devices including hard disk drives, floppy disks, compact disks, magnetic tapes and memory chips. I also know that during the search of the premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

i.    Searching computer systems is a highly technical process which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched.

ii.    Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

iii.    The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises. A single

[7]

megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 160 gigabytes (GB) of data are now commonplace in desktop computers. Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of 80 million pages of data, which, if printed out, would result in a stack of paper over four miles high. Further, a 160 GB drive could contain as many as approximately 150 full run movies or 150,000 songs.

(c)   Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband or instrumentalities of a crime.

## VII. SUMMARY OF INVESTIGATION/EVIDENCE

## A. EVIDENCE RELATED TO REAL ESTATE INVESTMENT SCHEME

14. Your affiant obtained bank records for the period February 2004 through August 2004 for a bank account under ZAFAR's own name from the Delaware County Sheriffs Office (DCSO). (Note: the DCSO obtained the records as part of an unrelated state investigation which was closed in 2009). This account had no single deposits over $1,000 during this limited time period. Information for this account post-dating August 2004 has not yet been obtained.

[8]

15. Your affiant has been unable to locate/identify thus far any interest bearing bank or investment accounts under ZAFAR's own name for the years 2006 to the 2008. IRS records do not reflect any Form 1099-Int interest or Form 1099-DIV dividend payments to Zafar or his wife, Cynthia King-ZAFAR for tax years 2006 - 2008. A review of bank records indicates ZAFAR has an interest bearing account opened April 30, 2009. A 1099-Int was reported to the IRS in the amount of $447. ZAFAR has two investment accounts with Chase Investment Services Inc. It is unknown to this affiant when the accounts were opened. However, in 2009 multiple Forms 1099-B were filled with the IRS. There were no Forms 1099-B filed in previous years.

16. Records obtained from JP Morgan Chase (Chase) Bank indicate that ZAFAR was an authorized signer/user on two bank accounts and one credit card account held in the name of Jack R. Johnson, Jr. (Johnson) from the date these accounts were opened on or after 2007 through the date they were closed by Chase bank for suspicious activity in July 2010. Your affiant knows that Johnson is the name of ZAFAR's father-in-law. The two bank accounts include a personal checking account (account #751913088) and a savings account (account #2748496276). The credit card account number is 5401 6830 6817 8513.

17. In 2008, Chase bank representatives conducted research and determined that ZAFAR, rather than Johnson, had conducted all of the transactions that occurred through the accounts referenced in Paragraph 13. On or about the period from March 3, 2008 through June 13 2008, Chase bank officials interviewed JOHNSON regarding these accounts. Johnson stated that he opened each of the accounts referenced in Paragraph 14 for ZAFAR's business use and that Johnson gave ZAFAR total control over the accounts. Johnson said ZAFAR is self-employed and runs several businesses related to clothing importation, real estate, automobile auctioning, music management, and exotic car leasing. (NOTE: A review of Johnson's personal Forms 1040 showed no indication that Johnson claimed any income from the deposits into these Chase accounts. Additionally, Forms 1099-Int were submitted to the IRS for account 751913088, for the years 2007, 2008, and 2009 in the name of Jacob R. Johnson. IRS records indicate Johnson did not report this interest on his personal income tax returns for the above mentioned tax years.)

18. The following is a breakdown of deposits received into Johnson's Chase Bank checking account, number 751913088:

| Year | Total Deposits | Number of Deposits | Deposits - Transfers From Others* | % of Deposits from Others to all Deposits |
|------|----------------|--------------------|-----------------------------------|-------------------------------------------|

[9]

| 2007 | $ | 403,832.38 | 47 | $ | 398,294.58 | 98.63% |
|---|---|---|---|---|---|---|
| 2008 | | 6,201,990.23 | 186 | | 6,153,991.82 | 99.23% |
| 2009 | | 5,236,556.34 | 177 | | 4,840,228.12 | 92.43% |
| 2010** | | 2,003,847.48 | 96 | | 1,434,360.88 | 71.58% |
| Total | $ | 13,846,226.43 | 506 | $ | 12,826,875.40 | 92.64% |

NOTE:*Deposits exclude interbank account transfers, visa rewards, monthly interest and returned purchased items. These deposits generally consisted of foreign and domestic fed wire transfer. A majority of these transfers came from Patwinder Sidhu.
**JP Morgan Chase closed all of Johnson's accounts as of July 27, 2010, due to multiple suspicious activities.

19. Information provided by Chase bank indicates that ZAFAR received 154 wire transfers payable to Johnson's Chase bank account, number 751913088, totaling $5,146,000 in 2008 and $3,345,000 in 2009 from Patwinder Sidhu (Sidhu). Sidhu wired these funds from Silicon Valley Bank, Merrill Lynch, Wachovia Bank, United Bank, Suntrust Bank, HSBC Bank, Citibank, Bank of America and Mellon Bank. Some of the transfers were from Sidhu's companies (Spectrum Solutions Group, Learn It Systems Inc and Nirbo Enterprises, LLC). There is no indication that these transfers represent loans to/from ZAFAR.

20. Silicon Valley bank officials interviewed Sidhu on December 10, 2008. Sidhu told the bank officials that ZAFAR is his business partner in a night club in Washington DC, named Josephine. Bank officials attempted to research Sidhu's claim via the internet but found no evidence of any business connections between Sidhu, ZAFAR, or any nightclub.

21. Your affiant interviewed Sidhu on October 5, 2010. Sidhu provided the following information:

    (a) On or about January 2008, Sidhu was looking to invest in the overseas market. Sidhu met ZAFAR through a mutual friend of Sidhu's investment banker. The investment banker's friend said Zafar had over $100 million in overseas accounts.

    (b) ZAFAR told Sidhu that his direct uncle, Chaudhry Mukhtar, just won an election and was now the Defence Minister of Pakistan. Mukhtar was in charge of buying property in Pakistan for the government. ZAFAR told Sidhu that Mukhtar will tell ZAFAR what land the government wants to buy and then ZAFAR and Sidhu will buy the land before the government does and then sell it to the government for a profit.

    (c) Sidhu began to transfer money to ZAFAR under the pretense that they were purchasing land in Pakistan and then selling it

[10]

to the Pakistan government within one year. There were no lawyers involved and no partnership agreements drawn up.

(d)   Sidhu wired the real estate investment money to an account at Chase bank, located in Columbus, OH. Sidhu asked why there was an account in Ohio. ZAFAR told Sidhu that they (ZAFAR's father's business) used to have a textile warehouse in Ohio and his father set up a link between Chase Bank and the Muslim Community Bank (MCB) in Pakistan. The link allowed Chase to wire money directly to MCB. ZAFAR said this would be done immediately after the money hit the Chase bank.

(e)   In the summer of 2008, ZAFAR told Sidhu that all of the land deals were complete. ZAFAR claimed he tried to wire Sidhu his proceeds, $91 million, but the wire did not go through. ZAFAR blamed the failure on his name being placed on the OFAC (Office of Foreign Asset Controls) list. ZAFAR told Sidhu that since the events of 9/11, OFAC was keeping people from transferring money out of Pakistan and other countries. Because ZAFAR's father was the #2 guy in the political party, the Pakistani Government placed ZAFAR's whole family on the World Wide OFAC List.

(f)   From January 2008 to August 2008, Sidhu wired ZAFAR approximately $3.9 million to purchase eight (8) Pakistani properties. The wires originated from Sidhu's personal and business bank accounts. All of the wires were sent to Chase bank account number 751913088. (Note: this is one of the accounts opened by Johnson for ZAFAR's business use as referenced in Paragraphs 14-17). ZAFAR told Sidhu the last property was sold to the Pakistani Government in August 2008. In total, ZAFAR told Sidhu the 8 property deals generated $182 million. Sidhu was entitled to 50% ($91 million) because he and ZAFAR were equal partners.

(g)   From August 2008 – February 2009, Sidhu transferred approximately $3.8 million more to ZAFAR's Chase bank account (number 751913088). ZAFAR told Sidhu he needed this money to pay for lawyer fees, bank fees, consulting fees, and payoffs to transfer the money from MCB to Sidhu's accounts in the United States. ZAFAR claimed he transferred $91 million to Sidhu but the money was stopped because ZAFAR was on the OFAC list. ZAFAR said he needed the additional funds to pay his lawyers to get the issue resolved.

[11]

(h)    Around February 2009, Sidhu asked his friends and family for money since Sidhu was out of funds. His friends agreed because they thought they would get their money back with interest within one or two weeks. ZAFAR would always explain why he needed money, how much he needed and the date by when it needed to be transferred. Between February 2009 and February 2010, Sidhu's friends and family transferred approximately $2 million to ZAFAR's Chase account, either directly or thru Sidhu.

(i)    In total, Sidhu and his friends transferred approximately $9.6 million to Zafar between January 2008 and February 2010.

(j)    In February 2010, ZAFAR told Sidhu that ZAFAR had sent another $50 million wire from the MCB account to Nirbo Enterprises, LLC's account at Wachovia Bank. ZAFAR said the wire never reached the Nirbo Enterprises account because Asif Ali Zardari (President of Pakistan) held it up.

(k)    As of October 5, 2010, Sidhu has not received any money from ZAFAR. Sidhu sold all of his interest in one of his businesses, Learn-It Systems, LLC, to repay his friends and family.

22. With Sidhu's consent, an IRS-CI Computer Investigative Specialist (CIS) searched Sidhu's Gmail account and provided this affiant with a file containing all the emails and attachments. The recovered emails included the following attachments:

(a)    Dated 09.02.2008 – Memo from the National Bank of Pakistan certifying that the current balance in ZAFAR's account (renamed as M/S Nirbo Enterprises) was Rupees 6,000,000,000, Eqv: USD $100 Million, signed by the Manager of Operations. As stated in Paragraph 19 (a), this was to be used for the overseas investments. Per Sidhu's instructions, ZAFAR changed the name on this account to Nirbo Enterprises.

(b)    Statement of Nirbo Enterprises, LLC from the National Bank of Pakistan with an opening balance of Rupees 6,000,000,000 on 09/02/2008.

(c)    Letter dated December 16, 2008, from Azam & Rai, Advocates and Legal Consultants (ZAFAR's attorney in Pakistan) to Megan McNelia Frantz at Silicon Bank,

[12]

addressing ZAFAR's OFAC issue. The letter was not signed.

(d) Letter dated August 24, 2009, from Chaudhry Mukhtar, Pakistan's Minister of Defence, to Patwinder Sidhu/Veer Investments. The unsigned letter appears on letterhead for the Ministry of Defense Pakistan.

(e) Letter dated September 8, 2009, from Chaudhry Mukhtar, Pakistan's Minister of Defence, to Patwinder Sidhu/Nirbo Enterprises, LLC. The letter was drafted on Ministry of Defence Pakistan letter head and signed.

(f) Wire Transfer Request Information Form from MCB, dated 2/21/2010, for $50,000,000. (Note: Sidhu claimed he and his friends called to verify this transfer and the representative at MCB stated the account number was false.)

23. The recovered emails referenced in Paragraph 19 came from Verizon Wireless Blackberry (#786-282-0444), and/or the following email accounts: hzafar@tmail.com, hzafar@me.com, hzafar10@gmail.com, and hzafar@att.blackberry.net. Ameet Johal (a friend of Sidhu that transferred money to ZAFAR directly and through Sidhu) identified Blackberry #786-282-0444 as Zafar's number. Johal claims he spoke to ZAFAR and sent text messages to him at this number. Joseph Pilatich (see Paragraph 22, below) also provided the same cell phone number to this affiant.

24. Your affiant interviewed Joseph Pilatich, Sidhu's friend on October 7, 2010. Your affiant also spoke with Special Agent Raymond Nafey of the New York FBI office on October 18, 2010. Pilatich and Nafey advised your affiant that Pilatich and others complained to the New York FBI office in March 2010 regarding their loans to Sidhu. The FBI researched bank reports issued on ZAFAR and Sidhu and traced the transfers between ZAFAR and Sidhu but found no evidence of any transfers of funds between the Chase bank accounts under ZAFAR's control in Columbus, Ohio and ZAFAR's bank accounts in Pakistan for the period of 2008 – February 2010. The FBI also discovered that ZAFAR's cell phone was being "pinged" off of cell phone towers in Miami and Ohio. (Note: Pilatich and Sidhu advised your affiant that ZAFAR told them he is based in Pakistan and occasionally travels to the United States. Whenever ZAFAR called, his number came up as private. When they questioned ZAFAR about his phone number, ZAFAR claimed he was using the phone of a friend who lived in the United States.)

[13]

25. On the letter dated August 24, 2009 from the Ministry of Defence referenced in Paragraph 20, the following discrepancies were identified:

   (a)  "Defense" is spelled with an "s" as opposed to a "c" in the main header.

   (b)  The letter is unsigned.

   (c)  Internet research was conducted by this affiant on the address listed on the letter. The letter states the address as "Chaudry Mukhtar, Minister of Defence, Islamic Republic of Pakistan, 55 Block C, Pak. Secretariat, Islamabad, Pakistan." Per yellow pages of Pakistan, The Ministry of Defence has an address of: Defence Division of Pak, Secretariat-11, Rawalpindi.

      i.  The address of 55 Block C comes up under the Ministry of Health per the yellow pages of Pakistan.

26. On the letter dated September 8, 2009 from the Ministry of Defence, referenced in Paragraph 20, the following discrepancies were identified:

   (a)  "Defence" is spelled as "Defense" within the body of the letter.

   (b)  The letter is signed and appears to be the same style of signature used by ZAFAR. This is based by looking at ZAFAR's signature on checks and travel documents. No handwriting exemplar has been completed.

   (c)  Internet research was conducted by this affiant on the address listed on the letter. The letter states the address as "Chaudry Mukhtar, Minister of Defence, Islamic Republic of Pakistan, 55 Block C, Pak. Secretariat, Islamabad, Pakistan." Per yellow pages of Pakistan, The Ministry of Defence has an address of: Defence Division of Pak, Secretariat-11, Rawalpindi.

      i.  The address of 55 Block C comes up under the Ministry of Health per the yellow pages of Pakistan.

   (d)  No address is used for Nirbo Enterprises, LLC. In the letter dated August 24, 2009 (referenced in Paragraph 20) a company address followed the company the letter was addressed to.

[14]

B. ASSET, BUSINESS AND TAX INFORMATION:

27. Information obtained from the Ohio Bureau of Motor Vehicles indicates that ZAFAR purchased and subsequently sold/transferred the following vehicles during the period 2006 thru 2009:

| Date | Purchase Price | Make | Year | Seller | Buyer |
|------|---------------|------|------|--------|-------|
| 06/13/2009* | $139,423 | Aston | 2009 | Midwestern Auto Group | Midwestern Auto Group |
| 07/13/2009** | $254,250 | Lamborghini | 2010 | Midwestern Auto Group | Midwestern Auto Group |
| 01/31/2008*** | $87,007 | Mercedes S5A | 2007 | Mercedes Benz of Easton | Mercedes Benz of Easton |

*Title transferred on 02/09/2010 back to Midwestern Auto Group. No lien documented.
**Title transferred on 09/01/2009 back to Midwestern Auto Group. No lien documented.
***Title transferred on 10/22/09 back to Mercedes Benz of Easton. ZAFAR financed the purchase through Wells Fargo.

28. Ohio BMV records indicate ZAFAR purchased the following vehicles with a lien being documented on their titles:

| Date | Purchase Price | Make | Year | Seller |
|------|---------------|------|------|--------|
| 10/20/2010** | $16,495 | Cadillac | 2003 | Mercedes-Benz |
| 08/29/2009* | $82,909 | Rolls | 2009 | Midwestern Auto Group |
| 11/29/2006* | $22,826 | Lexus | 2004 | Lindsay Acura |
| 02/02/2005* | $30,019 | Chevrolet | 2003 | Chesrown Pontiac |

*The Ohio BMV records indicate these vehicles have *active* registrations.
**The vehicle was purchased by ZAFAR, financed through Wells Fargo Auto Finance.

29. Ohio BMV records indicate that Ohio license plate number HZ 04 is registered to a 2010 Black Lamborghini, registered to ZAFAR. As described in the surveillance section of this affidavit, however, this plate has been observed by law enforcement officers on two different Mercedes Benz vehicles registered to ZAFAR.

30. Ohio Secretary of State records indicate that ZAFAR owns the following businesses:

    (a)    HZ Investments LLC d/b/a Voodoo Denim Lounge

    (b)    R Sourcing LLC f/k/a Rafia & Rafee Enterprises, LLC

    (c)    Rafee Investments LLC

    (d)    Team 10 Music Group, LLC

31. Tax records indicate that ZAFAR is/has been married to Cynthia King-ZAFAR (Cynthia) since at least 2006. Cynthia filed returns using the married filing separate filing status and included ZAFAR's SSN to identify her spouse for tax years 2006-2008. As detailed in Paragraphs 31-37, neither Cynthia nor ZAFAR have reported sufficient income to account for their lifestyle.

[15]

32. According to IRS records, no personal tax returns were filed in Zafar's name for tax years 2006 or 2007 by their respective statutory due dates of April 15, 2007 and April 15, 2008. ZAFAR did not request any extensions of time to file his tax year 2006 return. On or before April 15, 2008, ZAFAR did request and receive extensions to file his 2007 return on or before October 15, 2008. The IRS received both the 2006 and 2007 FORMS 1040, US Individual Income Tax Returns on November 27, 2009 and processed them on December 28, 2009.

33. IRS records indicate that ZAFAR submitted a $20,011 payment with the tax year 2007 extension request referenced in paragraph 30. The IRS had no record of any balance due on ZAFAR's tax account at that time. The IRS subsequently refunded this payment, less a $5,636.03 offset to another government agency, on 12/28/09.

34. In November 2009, the IRS received Forms 1040, personal federal income tax returns, in the name of Haider ZAFAR for both tax years 2006 and 2007. Both returns were "zero returns." This means every line item on the returns was filled in with a "$0". Accordingly, the ZAFAR did not report any income or tax due.

35. According to IRS records, ZAFAR requested and received an extension of time to file his tax year 2008 return by October 15, 2009. ZAFAR timely requested and received an extension of time to file his tax year 2009 return on or before October 15, 2010. As of November 29, 2010, there is no record of either a 2008 or 2009 return being filed in ZAFAR's name.

36. In sum, IRS records reflect the following tax information for Haider ZAFAR:

| Tax Years | Wages | Total Adjusted Gross Income | Total Taxable Income | Date Filed |
|-----------|-------|------------------------------|----------------------|------------|
| 2009* | $0 | $0 | $0 | DID NOT FILE |
| 2008* | $0 | $0 | $0 | DID NOT FILE |
| 2007 | $0 | $0 | $0 | 11/27/09 |
| 2006 | $0 | $0 | $0 | 11/27/09 |

*as of 11/29/10, these returns are not on file.

37. IRS records indicate Cynthia ZAFAR filed both her tax year 2006 and tax year 2007 personal tax returns on April 17, 2009 – one year after the 2006 return was due and two years after the 2007 return's statutory due date. Cynthia ZAFAR timely filed her tax year 2008 return. She requested and received an extension of time to October 15, 2010, to file her 2009 return. IRS records indicate Cynthia ZAFAR filed her 2009 personal return on November 8, 2010.

[16]

38. In sum, IRS records reflect the following tax information for Cynthia King-ZAFAR:

| Tax Years | Wages | Total Adjusted Gross Income | Total Taxable Income | Date Filed |
|-----------|-------|-----------------------------|----------------------|------------|
| 2009* | $0 | $ 5,849 | $0 | 11/08/10 |
| 2008 | $41,598 | $41,598 | $25,648 | 04/15/10 |
| 2007 | $53,285 | $53,285 | $37,735 | 04/17/10 |
| 2006 | $48,112 | $48,112 | $33,062 | 04/17/10 |

*The $5,849 is unemployment compensation received.

39. As noted in Paragraphs 14-17, ZAFAR received over $13 million in deposits to bank accounts under his control between 2007 and 2010. ZAFAR did not report any income from these deposits. A review of Johnson's tax returns suggests that JOHNSON did not report income from these deposits either.

40. HZ Investments was formed in early 2010. That company has filed Forms 941, Employer's Quarterly Federal Tax Returns, for the first two quarters of 2010. ZAFAR has a 25% interest in the business.

41. R Sourcing LLC f/k/a Rafia & Rafee Enterprises, LLC was formed in November of 2009. The IRS has no record of any returns being filed by or on behalf of this entity to date.

42. Rafee Investments LLC was formed in May of 2009. The IRS has no record of any returns being filed by or on behalf of this entity to date.

43. Team 10 Music Group LLC was formed in October of 2008. The IRS has no record of any returns being filed by or on behalf of this entity to date.

C. OTHER INCOME/LIFESTYLE INFORMATION:

44. On an indirect loan application with Mercedes-Benz of Columbus in October 20, 2010, for a 2003 Cadillac Escalade, ZAFAR listed the following information:

    (a)    Present address of 8195 Avery Road, Dublin, OH 43017.

    (b)    Telephone Number: (786) 282-0444.

    (c)    Mortgage holder of his residence at 8195 Avery Rd is through Wells Fargo, with payments of $1,500 per month.

    (d)    ZAFAR's employer is Fr Textile, located at 957 Maketewah Drive, Delaware, OH 43015. His occupation is "sales" and he has been at that job for 5 years and 2 months.

[17]

      (e)    ZAFAR's gross monthly salary is $43,416.

45. On November 5, 2009, DEA agents served a Federal Subpoena from the FBI, Miami Florida Office to ZAFAR at his residence of 8195 Avery Rd. ZAFAR consented to a search of his home. DEA agents only searched ZAFAR's home office. They found a safe which ZAFAR opened. Agents observed several potentially valuable watches and four or five unopened envelopes from Chase Bank addressed to ZAFAR. ZAFAR told the agents that the envelopes were investment statements. ZAFAR said he just gives the envelopes to his investments manager because he does not understand his investments. ZAFAR also provided the following additional information:

      (a)    ZAFAR is in the clothing/tee shirt business and is the owner of a textile factory in Pakistan. (Note: DEA agents found no information related to the textile company in ZAFAR's office.) ZAFAR stated that his uncle and cousins manage the business in Pakistan and that the proceeds from that business remain in accounts in Pakistan.

      (b)    ZAFAR also owns a clothing business in Columbus, OH and in Utah.

      (c)    ZAFAR's businesses do well financially. He makes over one million dollars annually. ZAFAR's local employees consist of his wife, Cindy, and his father-in-law, Jack Johnson

      (d)    ZAFAR recently inherited a substantial amount of money when his parents died and he brought that money to the United States. ZAFAR claimed he paid the required taxes on this money.

      (e)    ZAFAR is involved in a high value car rental business in California.

46. According to IRS-CID special agents in Miami, Florida, ZAFAR traveled at different times throughout the year down to South Beach. In August 2008, Florida IRS-CI agents met with ZAFAR for a proffer session on a Haitian drug case. ZAFAR was known to run around with this type of crowd in South Beach. ZAFAR was used as a rebuttal witness for the government against a Haitian drug trafficker. None of ZAFAR's finances were addressed in this proffer session. These Haitians would refer to ZAFAR as the "Prince of Dubai" as ZAFAR was always throwing money around down in South Beach. In October

[18]

2008, DEA agents observed ZAFAR in the South Beach, Florida area driving expensive cars and spending lavish amounts of money.

47. Local authorities conducted surveillance on ZAFAR in Delaware County, Ohio from late 2008 – early 2009. ZAFAR was observed driving expensive vehicles, and on one occasion, entering a private jet.

## D. REFUSE COLLECTION

48. CID agents retrieved the trash placed on the curbside at 8195 Avery Road, the known residence of Hader and Cynthia ZAFAR, on multiple dates between May and October 2010. The following is a summary of items discovered through each trash run:

    (a)   <u>May 29, 2010:</u>

- Multiple torn pieces of beige card stock. This affiant taped the pieces together, revealing a document titled "Haider's Business Interests"
- Multiple torn pieces of paper. This affiant taped the pieces together, revealing a document titled "Control Agreement." This agreement was signed by Theodore Lucas and listed Haider ZAFAR as a manager. This document was faxed from (305) 931-4115 by Alben Duffie
- Fax transmission log from Haider Zafar to number (305) 931-4115 (Alben Duffie's number)
- One (1) G&CO Couture Business Card for Cindy Zafar – Owner. The address was 721 N. High Street, Columbus, Ohio 43215
- One (1) Letter from Chase addressed to Jack R. Johnson at 8195 Avery Rd, Dublin Ohio 43017

    (b)   <u>June 3, 2010:</u>

- Torn papers this affiant attempted to piece back together, revealing an American Airlines Cargo receipt from T. Lucas at 3450 (street unknown) in Miami 33056
- Torn papers this affiant pieced back together revealing a copy of Theodore Lucas' passport
- One (1) note on Voodoo Lounge stationary with "Random – PC Password"

    (c)   <u>June 28, 2010:</u>

- Shreds of papers

[19]

(d)   <u>July 21, 2010:</u>

- One (1) note from Jeff Matthews, Financial Advisor from UBS Financial Services, about meeting with Haider when he gets back in town (dated May 18, 2009)
- One (1) Internet printout of EIN acceptance for R SOURCING LLC, EIN 27-1239817
- One (1) IRS Notice Number CP 504, dated 06-29-2009, for Cynthia King-Zafar, 8837 Juneberry Rd, Lewis Center, Ohio 43035, with a note "Pd Check #1510 485.59 mailed 7-6-09
- Third Quarter 2009 Quarterly Portfolio Review and Statements from Chase, "Prepared for Zafar" (account ending in 534) by Aaron D. Fuest, 111 Polaris Parkway, Columbus, OH 43217
- One (1) Trade Confirmation for account PZ3-031534, in the Name of Haider ZAFAR, dated 11-05-09
- One (1) Snapshot Chase Investments Account Number CA2-060488, Statement Date 10/01/09 to 10/31/09, showing "Total Portfolio $113,798.38"
- One (1) Snapshot Chase Investments Account Number PZ3-031534, Statement Date 10/01/09 to 10/31/09, showing "Total Portfolio $252,050.88"
- One (1) Proffer Letter to Michael Sachs, Esq. Miami, FL in RE: Haider Zafar, from the U.S. Department of Justice Southern District of Florida, dated June 24, 2008
- One (1) check stub MB Dallas Direct Finance for $20,100.00, for invoice number 7002721901 – Security Deposit Refund Linda 5590
- One (1) Letter dated June 28, 2010, to Haider Zafar from "AmeriCredit" "Your application for credit was forwarded to us by MERCEDES BENZ OF EASTON.  We regret that we are unable to approve your application."
- One (1) beige torn typed paper titled "Forever Diamonds 123 Avenue B, Suite 3S – New York, N.Y. 10009 tel 646.425.8111  fax 310.777.7565, with the following information:
  mannie@dunamustimepieces.com
  - Bank Info.
    Bank of America
    Tel # 1 800 432 1000
    8111 Beneva Road
    Sarasota, FL 34238
  - Account Info.
    Manoel Machado

[20]

Swift # bofaus3n
Routing # 026009593
Account # 003764030180
- o The address to ship the car.
Contact person, Kim Tilles
Tel. # 941 726 1222
3621 North Point Road APT. 502
Osprey FL 34229
- One (1) piece of typed paper titled "TRAVELING, HOTEL, FOOD EXPENSES FOR THE BUSINESS TEAM 10 LLC, G&CO. 2008 with the following information :
  - o TRAVELING EXPENSES: $372,633.05
    HOTEL AND FOOD: $817602.94
GIFT:              $59,068.00
  - o INVESTMENT TO CARE FREE: $300,000
  - o INVESTMENT TO LUXURY GROUP PARTNER: $70,000.00
  - o INVESTMENT TEAM 10: $200,000.00
  - o INVESTMENT G&CO, 175,000
- One (1) US Bank Gold Checking Statement dated May 20, 2010 through Jun. 17, 2010 in the name of Cynthia King-Zafar
- One (1) Insurance Appraisal from Chopard Boutique for Mr. Heider Zafar 450 5th Alton Rd, Miami, FL 33139, 3054579977, dated Apr.25.2008 for:
  - o Ring – Red Gold $7,380.00
  - o Happy Sport Watch $6,950.00
- One (1) Invoice from Chopard Boutique for Mr. Heider Zafar 450 5th Alton Rd, Miami, FL 33139, 3054579977, dated Apr.25.2008 for (paid by credit card V 4867960010710142 03/11 054717:
  - o Ring – Red Gold $6,500.00
  - o Happy Sport Watch $6,100.00

(e)    August 25, 2010:

- One (1) front and back copy of US Bank FlexPerks Visa for Voodoo Denim Lounge, business check card
- One (1) Letter envelope containing three (3) invoices from Dinsmore & Sholh LLP, Client Number 50045.2, addressed to Haider Zafar at 8195 Avery Rd, Dublin OH 43017
  - o Invoice # 2495920 – Immigration Matters
  - o research on Haider's possible divorce from US citizen and timing and nature of any criminal matters being bars to naturalization

[21]

  o Invoice #2495072 – General Matters
    ▪ Meeting with Haider Zafar, Ted Lucas, John
      Jolley, and Jeff Willis regarding H.T.
      International Enterprises, LLC on 5/26/10
    ▪ Develop and amend Development
      Agreement for Avrada, Colorado Hotel
      (6/1/10 – 6/30/10), which included
      conference calls and emails from Jeff Willis,
      Haider Zafar and Ted Lucas
  o Invoice 2496184 – Music Related Matters
    ▪ Management deals and recording contracts
      for Kid Billionaire; New York State filings for
      Kid Billionaire (multiple dated in June)

(f)  September 1, 2010:

- One (1) Chase Savings Summary of Natori S King by Jack R
  Johnson Jr OTMA at 8195 Avery Rd, Dublin Oh 43017;
  Account Number 00002748496532, July 23, 2010 – August
  20, 2010; Beg Balance of 8,080.54 and a July 28 withdrawal
  of $8,080.54

(g)  September 15, 2010:

- One (1) Chase Bank statement dated 8/25/10 in the name of
  Natori King and Cynthia King, account number 830459889,
  showing a beginning balance $528.88 and a withdrawal on
  7/29/10 of $528.99 for a zero balance
- One (1) Chase Bank statement dated 8/25/10 in the name of
  Cynthia King-ZAFAR, account number 793368762, showing
  a beginning balance of 5688.93, deposits of $9,304.52, and
  purchased and withdrawals of $14,993.45, leaving a zero
  balance
- One (1) Chase Credit Card Statement 5401 6830 8379
  8246, with no balance due and a $50,000 credit limit, in the
  name of Jack R. Johnson and Margaret M Johnson, closing
  date 8/24/10
- One (1) Letter from Woodside Credit, unable to grant credit
  to Haider Zafar based on Derogatory Credit, dated
  8/26/2010
- One (1) Letter from Credit One Bank for account number
  ending in 2698 addressed to Haider Zafar, with regrets to a
  credit line increase due to the fact that the account has been
  opened for less than one year.

[22]

(h)  October 13, 2010:

- One (1) Demonstration Agreement from Mercedes Benz of Easton, dated 6/10/10, for a Black 2010 S550 V4, signed by Haider Zafar, telephone number 786-282-0444
  - Written on the back side is "Chase 513-985-5165 Scott"
- One (1) Letter from Wells Fargo Dealer Services, dated 09/05/10, to Haider Zafar, in reference to a loan application submitted by MERCEDES BENZ OF EASTON, unable to grant credit based on:
  - Excessive Inquiries in credit file; excessive revolving debt utilization; excessive delinquent past or present credit experience
- One (1) Vehicle Renewal Application – Ohio Department of Public Safety Bureau of Motor Vehicles for Plate EGM5622, Purchase date 01/31/2008, Reg. Expires 12/14/2010, Vehicle – 2007 MERZ 4S, Title Number 2509103111, VIN WDDNG86X97A121477; to Haider Zafar 7652 Wayside Ave, Delaware OH 43015
- One (1) Vehicle Renewal Application – Ohio Department of Public Safety Bureau of Motor Vehicles for Plate HZ01, Purchase date 08/29/2009, Reg. Expires 12/14/2010, Vehicle – 2009 ROL CN, Title Number 2510051646, VIN SCA2D68529UX16332 County: Franklin, Tax Dist. Dublin; to Haider Zafar 8195 Avery Rd, Dublin OH 43017
- One (1) Vehicle Renewal Application – Ohio Department of Public Safety Bureau of Motor Vehicles for Plate HZ02, Purchase date 06/13/2009, Reg. Expires 12/14/2010, Vehicle – 2009 ASTO CN, Title Number 2509930472, VIN SCFBF04C19GD12655, County: Franklin, Tax Dist. Dublin; to Haider Zafar 8195 Avery Rd, Dublin OH 43017
- One (1) Vehicle Renewal Application – Ohio Department of Public Safety Bureau of Motor Vehicles for Plate HZ04, Purchase date 06/18/2009, Reg. Expires 12/14/2010, Vehicle – 2010 LAMO 2S, Title Number 2509958616, VIN ZHWGU6AU5ALA0895 ty03, County: Franklin, Tax Dist. Dublin; to Haider Zafar 8195 Avery Rd, Dublin OH 43017

49.  CID Agents retrieved the trash placed on the curbside at 957 Maketweah Drive, Delaware, OH, the known residence of Jack R. Johnson, on multiple dated between August and October 2010.  The following summarizes items collected at each trash run:

[23]

(a)    August 31, 2010:

- Multiple torn unused checks titled Haider ZAFAR at 957 Maketewah Dr, Delaware, OH 43015 from a Chase Checking account number 751913088
- Carbon Copy of Chase Checkbook account number 751913088, titled Haider ZAFAR at 957 Maketewah Dr, Delaware, OH 43015, starting with check 1181 to 1210. Most of the checks were signed by Johnson.
- Full Chase Checkbook Account number 751913088, titled Haider ZAFAR at 957 Maketewah Dr, Delaware, OH 43015, starting with check 1211 to 1240. Checks 1211 & 1212 were carbon copies signed by Johnson.
- One (1) used checkbook, with only deposit slips remaining for Chase Account 751913088 titled Haider ZAFAR at 957 Maketewah Dr, Delaware, OH 43015
- Multiple torn unused checks for Chase Account number 410011605906, titled Margaret Johnson and Jack R. Johnson, Jr. at 957 Maketewah Dr., Delaware OH 43015, checks 1006 – 1026.
- One (1) torn check #99 from Huntington titled Jacob R Johnson Jr, at 957 Maketewah Dr Delaware, OH 43015, account number 02891080855
- Two (2) Savings Account Deposit Books for Bank One, account number 1610894600 (Jack or Margaret Johnson)
- One (1) Chase Savings Deposit Book, account number 2748495948, with "Rafee Savings" hand written on the front
- One (1) Chase Savings Deposit Book, account number 2748496532, with "Tori Savings" hand written on the front
- One (1) Chase Savings Deposit Book, account number 2748497977, with "Cindy Savings" hand written on the front
- One (1) Chase savings deposit slip, dated 01/31/2008, for $10,000 into account ending in 5948. "Rafee & Tori Saving" hand written on the top of the slip.
- One (1) Chase Checking withdrawal receipt, dated 03/10/2010, for $1,500.00 from account ending in 3088
- One (1) 3x5 index card, with the following writing on it:
  - "5K – Wayne"
  
  "200K – New acct"
  
  "HZ invest"
  
  "100-120-Thurs"
- Two (2) cut up Chase debit cards
- Multiple torn pages of JPMorgan Online Printout for account …2529 from 07/27/2010 to 04/23/2010, printed on 7/29/10
- Multiple torn pages of JPMorgan Online Printout for account …2529, for July 2010, printed 8/6/10

[24]

- Two (2) Letters from Huntington National Bank, that contained bank cards
  - o Margaret Johnson:  4432 2018 9512 4968
  - o Jacob R Johnson Jr: 4432 2018 9512 4984
- One (1) Huntington Bank Online Printout "Huntington At Work (02891080855) " for the period 7/1/2010 to 8/22/2010

(b)  September 14, 2010:
- One (1) empty mailing from Land Rover North America
- One (1) State of Ohio – Bureau of Motor Vehicles Certificate of Registration for: Plate No: HZ03, Owner Name Jacob R Johnson Jr
- One (1) US Auto Protection for new coverage service for 2007 Mercedes-Benz
- Top portion of an IRS Notice sent to Jacob R & Mary M Johnson Jr

(c)  October 19, 2010:
- One (1) Huntington Online bank statement for the period 10/04/2010 to 10/06/2010, printed on 10/8/2010
- One (1) torn Huntington Online bank statement for account "Huntington At Work (02891080855)" for the period 9/21/2010 to 10/5/2010, printed on 10/5/2010

## E. SURVEILLANCE

50. Surveillance was conducted at 8195 Avery Rd, Dublin OH 43017, unless otherwise noted.   All times listed are approximate.   The following are significant events that were observed:

(a)  04/9/10 – 9:30 AM: a Black Jeep Liberty, Ohio license plate DYL 8281, pulled into the driveway of 8195 Avery Rd.   The vehicle is registered to Rosilaine C. Silva.  The garage door opened and an unidentified male, suspected to be ZAFAR exited the garage with a little girl on a bicycle.

i. 9:55 AM: Silva, the unidentified male (later identified as ZAFAR), and another unidentified female entered the Jeep and drove off.

ii.  4:40 PM: a male later identified as Jacob R. Johnson was observed walking around the front yard at 8195 Avery with a dog.  There was a young boy playing in the front yard.  Parked in the driveway was a silver Dodge Caliber, Tag number EYT 6514. The vehicle is registered to EAN Holdings, LLC.

[25]

(b)    04/12/10 – 6:45 AM: a drive by was conducted at Johnson's residence located at 957 Maketewah, Delaware OH. A Silver Caliber, license plate number EYT 6514 was observed parked in the driveway.

(c)    04/12/10 – 9:16 AM: the Black Jeep Liberty and a Black Mercedes Benz SUV, Ohio license plate EUW 1622, (registered to Johnson) was observed in the driveway.

      i.  10:20 AM: a Liquid Luster van pulled into the neighbor's driveway. Silva met the worker. The worker backed out the white Mercedes Sedan (HZ 04) from the neighbor's garage and detailed the car.

      ii.  10:20 AM: a red SUV, Ohio plate number DYT 4169, parked in ZAFAR's driveway. Two white males exited the vehicle, one carrying a manila folder in his left hand. The SUV was registered to Jeffery Willis, an attorney at Dinsmore & Sholh, LLP.

      iii.  11:43 AM: the worker from Liquid Luster completed detailing the white Mercedes Sedan (HZ 04) and backed it into the neighbor's garage. ZAFAR exited his garage and met with the worker from Liquid Luster. ZAFAR walked over to the neighbor's garage, while the worker backed the white Mercedes Sedan (HZ 04) out of the garage and handed ZAFAR the keys. The worker entered his van and left the premise.

(d)    05/17/10 – 12:38 AM: a FedEx delivery employee dropped off one (1) large envelope package.

(e)    07/19/10 – 10:28 PM: the Black Land Rover (HZ 03) was observed pulling into the garage. There were two vehicles parked in ZAFAR's driveway, the white Mercedes Sedan (HZ 04) and a white Mercedes SUV (Florida License Plate 275 YED). The vehicle is registered to Ryan Hubbard (Hubbard), a resident of Florida.

(f)    07/28/2010 – 9:58 AM: Special Agent Beebe conducted refuse collection. While collecting the refuse, a White Honda Odyssey minivan (Ohio license plate ERF 2028), registered to Vandernor S. Barbosa pulled into the driveway. The minivan had two unidentified males in the vehicle. Within five minutes, the minivan left ZAFAR's home.

[26]

(g)     08/24/10 – 9:21 AM: the white Mercedes SUV (275 YED) was observed in ZAFAR's driveway along with a Silver Mercedes SL63, license plate number HZ 04 (NOTE: this is the first time the Silver Mercedes was observed).    At approximately 12:34 PM ZAFAR was observed out front of his home talking on the phone.  At approximately 12:47 PM, ZAFAR entered his residence.

## VIII. CONCLUSION

51. Based on the foregoing, your affiant submits that there is probable cause to believe Haider ZAFAR has committed wire fraud in violation of 18 U.S.C. 1343; money laundering in violation of 18 U.S.C. §1956 and 1957; tax evasion in violation of 26 U.S.C. §7201; filed false returns for tax years 2006 and 2007 in violation of 26 U.S.C. §7206; and that he willfully failed to file returns in violation of 26 U.S.C. §7203. Your affiant further submits that there is probable cause to believe fruits, evidence, and instrumentalities of these crimes are located at 8195 Avery Road, Dublin, OH 4301 (the known residence of Haider and Cynthia ZAFAR) and 957 Maketewah Drive, Delaware, OH 43015 (the known residence of Jack and Margaret Johnson)

52. Wherefore, I request that a warrant be issued to me, pursuant to Rule 41 of the Federal Rules of Criminal Procedures, to search the locations set forth in Attachment A for those items set forth in Attachment B (said Attachments are hereby incorporated by reference).


_____

Kenneth G. Beebe
Special Agent, IRS-CI

Subscribed and sworn to before me


This _____ day of _____ , _____ .


_____

*UNITED STATES MAGISTRATE JUDGE*

[27]

## Additional Information Since January 2013

I, Charles T. Birch, having been duly sworn, depose and state:

## BACKGROUND AND QUALIFICATIONS OF AFFIANT

I am a Special Agent for the Internal Revenue Service – Criminal Investigation (hereafter IRS-CI), United States Department of the Treasury, assigned to the Columbus, Ohio office. I have been employed as a special agent since 2005 and my current duties include the investigation of federal crimes, including money laundering and criminal tax violations. As a special agent of the IRS-CI, I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7). As such, I am empowered to conduct investigations of and make arrests for offenses for offenses enumerated in Title 18, United States Code, Section 2516.

The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## Overview

53. HAIDER ZAFAR (ZAFAR) has been the target of an investigation since at least January 2011. As described above, the Government intends to prove that ZAFAR created an elaborate scheme to defraud Patwinder Sidhu, and others, out of more than $10 million.

54. Since at least January 2013, ZAFAR has resided primarily in the greater Miami, Florida area and he regularly travels to Central Ohio; presumably to see his son who lives with ZAFAR'S estranged wife.

55. In March 2013, your Affiant spoke with Alex J. Alfano (Alfano) who is an attorney located in the Miami, Florida area. Bank records showed that Alfano had recently transferred hundreds of thousands of dollars into an account titled to ZAFAR. Alfono stated he was an 'escrow agent' for monies that were loaned to ZAFAR from at least one person located in South Florida who Alfono described as a well known "personality" in the area. ZAFAR told Alfono that he was from a wealthy family in Pakistan but they were not able to send him any money due to the investigation being conducted by the Internal Revenue Service – Criminal Investigation Division (IRS-CID). Furthermore, ZAFAR told Alfono that the IRS-CID had frozen all of his assets and seized his bank accounts. (NOTE: In approximately January 2011, IRS-CID executed seizure warrants for jewelry. There were no bank accounts frozen or seized.)

[28]

56. In May 2013, your affiant spoke with a Federal law enforcement officer (FLEO) in the Miami, Florida area that was familiar with the source of the funds for which Alfono is the escrow agent. According to the FLEO, ZAFAR told a wealthy Broward County resident that he is from a wealthy family in Pakistan but he was unable to receive money from them due to the incorrectly being put of the list maintained by the Office of Foreign Asset Control (OFAC). ZAFAR told this person that he has approximately $40 million in a Swiss bank account in that he would be willing to invest this money into one or more of the person's businesses. In exchange, ZAFAR requested the person to loan him approximately $2 million while he worked through the process of being removed from OFAC's list. At some point in March 2013, ZAFAR signed an unsecured promissory note for $2 million dollars which is due in approximately 24 months (March 2015).

57. On the morning of May 23, 2013 Assistant United States Attorney (AUSA) Dale Williams transmitted a draft of a plea agreement to Michael Crites (Crites), ZAFAR'S criminal defense attorney. Crites previously told AUSA Williams that he was meeting with ZAFAR at some point during the afternoon of May 23, 2013 and that he wanted to be able to present a draft plea agreement to his client, ZAFAR, so he would understand what his exposure was in the ongoing criminal investigation. (NOTE: per the Sentencing Guidelines calculation contained in the draft plea agreement, ZAFAR could be sentenced to a term of imprisonment if found guilty.) It is unknown to your Affiant as to whether or not Crites and ZAFAR met on the afternoon of May 23, 2013.

58. On May 24, 2013 the FLEO located in the Miami, Florida was told by a credible source of information that ZAFAR, a citizen of Pakistan, had picked up, or caused it to be picked up, his Pakistani passport from the Florida State Attorney's Office. ZAFAR'S passport was being held by the Florida State Attorney's Office due to him being a person of interest in an attempted homicide investigation. Ultimately, your Affiant believes that ZAFAR was cleared of any wrong doing. Also, this FLEO learned from the same source of information that ZAFAR was overheard arguing with a person described as his bodyguard as to which vehicle he, ZAFAR, was going to "pack up" and take to Ohio.

59. On May 26, 2013 at approximately 3:30 am, ZAFAR rented a hotel room at the Holiday Inn Express & Suites located at 8670 Orion Place, Columbus, Ohio. ZAFAR is scheduled to check out on May 29, 2013. Your Affiant saw a black Bentley convertible in the hotel's parking lot which bears a Florida license plate (BVP T93). This vehicle is registered Benjamin Bermudez who reportedly works for a luxury

vehicle sales company in South Florida. Although the hotel regularly registers its guest's vehicles, this was not done when ZAFAR checked in.

### Conclusion

60. Based on the foregoing, the Affiant believes there is probable cause to issue a criminal complaint to charge HARIDER ZAFAR with the offense of wire fraud (18 USC 1343), that the Court approves the Complaint as submitted. The Affiant further request based upon a concern that HZ may flee the United States based on recent events, that the court issues an Arrest Warrant for him. Wherefore, I request that a warrant be issued to me, pursuant to Rule 4 of the Federal Rules of Criminal Procedures, to arrest Haider ZAFAR.

Charles T. Birch
Special Agent, IRS-CI

Subscribed and sworn to before me

This _26th_ day of _MAY_ , _2013_ .

**UNITED STATES MAGISTRATE JUDGE**
N th KING

[30]