05/29/2013

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

United States of America )
v. )
 ) Case No. 2:13-MJ-00286
HAIDER ZAFAR )
 )

*Defendant*

## AMENDED
## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date of 01/04/2008 – 02/25/2010 in the county of ___Delaware___ in the ___Southern___ District of ___Ohio___, the defendant violated __18__ U.S.C. § __1343__, an offense described as follows:

Fraud by Wire, Radio, or Television

This criminal complaint is based on these facts:
See Attached Affidavit

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Charles T. Birch, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 5/30/2013

_____
*Judge's signature*

Terence P. Kemp - U.S. Magistrate Judge
*Printed name and title*

City and state: Columbus, OH

I, Charles T. Birch, having been duly sworn, depose and state:

## BACKGROUND AND QUALIFICATIONS OF AFFIANT

I am a Special Agent for the Internal Revenue Service – Criminal Investigation (hereafter IRS-CI), United States Department of the Treasury, assigned to the Columbus, Ohio office. I have been employed as a special agent since 2005 and my current duties include the investigation of federal crimes, including money laundering and criminal tax violations. As a special agent of the IRS-CI, I am an investigative or law enforcement officer of the United States, and as such, I am empowered to conduct investigations of and make arrests for federal offenses.

The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested criminal complaint and does not set forth all of my knowledge about this matter.

### I. OUTLINE/BACKGROUND

1. The facts and conclusions set forth in this affidavit are based on my knowledge, training and experience, that of senior agents with whom I have conferred, bank records, tax records, public records, witness interviews, trash pulls and surveillance. Based on the information detailed herein, I submit that there is probable cause to believe HAIDER ZAFAR has committed the offense of wire fraud, in violation of 18 U.S.C. 1343 and the additional following offenses:

    (a) <u>18 U.S.C. 1956(a)(1)(B)(i):</u> Money Laundering;

    (b) <u>18 U.S.C. §1957</u>: Transactional Money Laundering;

    (c) <u>26 U.S.C. §7201</u>: Tax Evasion;

    (d) <u>26 U.S.C. §7203</u>: Failure to File Tax Returns;

    (e) <u>26 U.S.C. §7206</u>: False Tax Returns

2. I submit that there probable cause to believe ZAFAR has committed one or more of these offenses by:

    (a) Sending false information via email in an effort to solicit investors for a real estate scheme;

[1]

    (b)    Receiving domestic wire transfers under fraudulent and false pretenses, representations, or promises;

    (c)    Knowingly conducting financial transaction involving wire fraud proceeds through nominee bank accounts with the intent to conceal or disguise the nature, location, source, ownership, or control of property;

    (d)    Knowingly engaging in monetary transactions in excess of $10,000 with wire fraud proceeds;

    (e)    Willfully failing to report business and personal income derived from businesses under ZAFAR's ownership, direction, and control;

    (f)    Willfully attempting to evade the assessment and/or collection of taxes;

    (g)    Willfully failing to file personal federal income tax returns; and

    (h)    Willfully making and subscribing false personal federal income tax returns for tax years 2006 and 2007.

3. This investigation originated from information provided by a cooperating witness (CW). The CW claimed HAIDER ZAFAR (ZAFAR) was purchasing luxury vehicles over $100,000 from local Columbus area car dealerships. The CW said Mercedes Benz Financial (MB) believed ZAFAR was either a drug dealer or had access to non-legitimate income and turned down his credit. After MB turned down ZAFAR for credit, ZAFAR paid for the vehicles with large sums of cash in certified funds.

4. ZAFAR is of Pakistani decent. According to US Immigration and Customs Enforcement (ICE), ZAFAR is not a naturalized citizen. ZAFAR has a lawful permit/alien card for the United States. ZAFAR also has the following variations of his name: Haider ZAFAR Khan Kanju or Syed Haider ZAFAR Kanju Siddique Shah or Haider ZAFAR. ZAFAR is also known to go by "Chip."

5. In December 2007, ZAFAR devised a real estate investment scheme to obtain money under false pretenses and representation and targeted one investor, Patwinder Sidhu (Sidhu). Beginning in January 2008 through February 2010, ZAFAR received approximately $10 million from Sidhu. ZAFAR solicited the funds for real estate ventures in Pakistan using questionable papers including letters issued under

[2]

the name of a Pakistani government official, Chaudhry Mukhtar (Mukhtar). ZAFAR told Sidhu that Mukhtar is his, ZAFAR's, direct uncle and the Defence Minister of Pakistan. Mukhtar was in charge of buying property in Pakistan for the government. ZAFAR told Sidhu that Mukhtar will tell ZAFAR what land the government wants to buy and then ZAFAR and Sidhu will buy the land before the government does and then sell it to the government for a profit. ZAFAR emailed the documents to Sidhu and received the investment funds through several large dollar wire transfers, ranging from $20K - $300K per wire. Monies were transferred from Sidhu, his friends and family members various bank accounts into one Chase bank account located in Columbus, Ohio, account number XXXXX3088. The transfers were initiated from several banks, all located outside the state of Ohio. The majority of the bank accounts are located in the Potomac, Maryland area and the Washington DC area. All transfers were fedwire transfers and occurred by the direction of ZAFAR.

6. ZAFAR told the investor the real estate deals were successfully completed but had offered various false explanations as to why the investor had not received any share of the profits. ZAFAR made the excuse that his name is on the Office of Foreign Asset Controls (OFAC) list. A special agent contacted OFAC and a representative reviewed the lists for 2007 – 2010. ZAFAR's name was not on the list. ZAFAR claimed his uncle was the Prime Minister of Defence in Pakistan and emailed Sidhu and his friends signed documents from his uncle. These documents appear to be fraudulent. No relation between ZAFAR and the Prime Minister of Defence appears to exist. Furthermore, ZAFAR lied to banking officials and claimed the transfers were profits from a domestic night club.

7. ZAFAR used the proceeds from the fraudulent investment scheme to purchase luxury items. These proceeds were concealed in a Chase bank account (#XXXXX3088), under a nominee name. The main account holder was Jacob R. Johnson, ZAFAR's father-in-law. Johnson told bank officials that ZAFAR controls this account. The luxury items were purchased using direct checks or debit card transactions from the Chase account (#XXXXX3088) or with credit cards. The credit cards were also in the name of Johnson, with ZAFAR being an authorized user. All of the payments to the credit cards were direct withdraws/transfers from the Chase bank account (#XXXXX3088). ZAFAR purchased luxury vehicles including, among others, a Lamborghini, a Rolls Royce Phantom, and several Mercedes Benz's. ZAFAR also used the proceeds to purchase high end jewelry from a company called Diamond Cellar. All invoices from Diamond Cellar were obtained by a special agent. A total of 26 pieces of jewelry were purchased, having a total value over $200K. The items included a $35,000 diamond and several watches, one priced at $42,000.

8. IRS records indicate that ZAFAR has not reported any income to the IRS for the past four tax years. He did not file any tax returns for tax years 2008 and 2009. ZAFAR filed in November 2009 belated "zero" returns (meaning all line items were answered with a $0) for tax years 2006 and 2007. Bank deposit information, lifestyle evidence, and ZAFAR's admissions indicate that ZAFAR has substantial unreported income for each of these tax years. As detailed below, ZAFAR claims he makes $1 million a year from his numerous successful foreign and domestic businesses. Bank records and witness statements suggested that ZAFAR was conducting financial transactions through nominee bank accounts. Those accounts received more than $10 million in deposits from January 2008 through July 2010.

## II. SUMMARY OF INVESTIGATION/EVIDENCE

### A. EVIDENCE RELATED TO REAL ESTATE INVESTMENT SCHEME

9. A special agent obtained bank records for the period February 2004 through August 2004 for a bank account under ZAFAR's own name from the Delaware County Sheriffs Office (DCSO). (Note: the DCSO obtained the records as part of an unrelated state investigation which was closed in 2009). This account had no single deposits over $1,000 during this limited time period.

10. A special agent has been unable to locate/identify thus far any interest bearing bank or investment accounts under ZAFAR's own name for the years 2006 to the 2008. IRS records do not reflect any Form 1099-INT interest or Form 1099-DIV dividend payments to Zafar or his wife, Cynthia King-ZAFAR for tax years 2006 - 2008. A review of bank records indicates ZAFAR has an interest bearing account opened April 30, 2009. A 1099-INT was reported to the IRS in the amount of $447. ZAFAR has two investment accounts with Chase Investment Services Inc. It is unknown to this Affiant when the accounts were opened. However, in 2009 multiple Forms 1099-B were filled with the IRS. There were no Forms 1099-B filed in previous years.

11. Records obtained from JP Morgan Chase (Chase) Bank indicate that ZAFAR was an authorized signer/user on two bank accounts and one credit card account held in the name of Jack R. Johnson, Jr. (Johnson) from the date these accounts were opened on or after 2007 through the date they were closed by Chase bank for suspicious activity in July 2010. Your Affiant knows that Johnson is the name of ZAFAR's father-in-law. The two bank accounts include a personal checking account (account #XXXXX3088) and a savings account (account

[4]

#XXXXXX6276). The credit card account number is XXXX XXXX XXXX 8513.

12. In 2008, Chase bank representatives conducted research and determined that ZAFAR, rather than Johnson, had conducted all of the transactions that occurred through the accounts. On or about the period from March 3, 2008 through June 13 2008, Chase bank officials interviewed JOHNSON regarding these accounts. Johnson stated that he opened each of the accounts for ZAFAR's business use and that Johnson gave ZAFAR total control over the accounts. Johnson said ZAFAR is self-employed and runs several businesses related to clothing importation, real estate, automobile auctioning, music management, and exotic car leasing. (NOTE: A review of Johnson's personal Forms 1040 showed no indication that Johnson claimed any income from the deposits into these Chase accounts. Additionally, Forms 1099-INT were submitted to the IRS for account XXXXX3088, for the years 2007, 2008, and 2009 in the name of Jacob R. Johnson. IRS records indicate Johnson did not report this interest on his personal income tax returns for the above mentioned tax years.)

13. Information provided by Chase bank indicates that ZAFAR received 178 wire transfers payable to Johnson's Chase bank account, number XXXXX3088, totaling $4,976,000 in 2008 and $4,519,000 in 2009 from Patwinder Sidhu (Sidhu), or others making transfers on Sidhu's behalf. Sidhu wired these funds from Silicon Valley Bank, Merrill Lynch, Wachovia Bank, United Bank, Suntrust Bank, HSBC Bank, Citibank, Bank of America and Mellon Bank. Some of the transfers were from Sidhu's companies (Spectrum Solutions Group, Learn It Systems Inc and Nirbo Enterprises, LLC). The other individuals who transferred funds on Sidhu's behalf wired their funds from financial institutions located outside of Ohio. There is no indication that these transfers represent loans to/from ZAFAR.

14. Silicon Valley bank officials interviewed Sidhu on December 10, 2008. Sidhu told the bank officials that ZAFAR is his business partner in a night club in Washington DC, named Josephine. Bank officials attempted to research Sidhu's claim via the internet but found no evidence of any business connections between Sidhu, ZAFAR, or any nightclub.

15. A special agent interviewed Sidhu on October 5, 2010. Sidhu provided the following information:

    (a) On or about January 2008, Sidhu was looking to invest in the overseas market. Sidhu met ZAFAR through a mutual friend

[5]

of Sidhu's investment banker. The investment banker's friend said Zafar had over $100 million in overseas accounts.

(b) ZAFAR told Sidhu that his direct uncle, Chaudhry Mukhtar, just won an election and was now the Defence Minister of Pakistan. Mukhtar was in charge of buying property in Pakistan for the government. ZAFAR told Sidhu that Mukhtar will tell ZAFAR what land the government wants to buy and then ZAFAR and Sidhu will buy the land before the government does and then sell it to the government for a profit.

(c) Sidhu began to transfer money to ZAFAR under the belief that they were purchasing land in Pakistan and then selling it to the Pakistan government within one year. There were no lawyers involved and no partnership agreements drawn up.

(d) Sidhu wired the real estate investment money to an account at Chase bank, located in Columbus, OH. Sidhu asked why there was an account in Ohio. ZAFAR told Sidhu that they (ZAFAR's father's business) used to have a textile warehouse in Ohio and his father set up a link between Chase Bank and the Muslim Community Bank (MCB) in Pakistan. The link allowed Chase to wire money directly to MCB. ZAFAR said these wire transfers would be done immediately after the money hit the Chase bank.

(e) From January 2008 to August 2008, Sidhu wired ZAFAR approximately $3.9 million to purchase eight (8) Pakistani properties. The wires originated from Sidhu's personal and business bank accounts. All of the wires were sent to Chase bank account number XXXXX3088. ZAFAR told Sidhu the last property was sold to the Pakistani Government in August 2008. In total, ZAFAR told Sidhu the 8 property deals generated $182 million. Sidhu was entitled to 50% ($91 million) because he and ZAFAR were equal partners.

(f) In the summer of 2008, ZAFAR told Sidhu that all of the land deals were complete. ZAFAR claimed he tried to wire Sidhu his proceeds, $91 million, but the wire did not go through. ZAFAR blamed the failure on his name being placed on the OFAC list. ZAFAR told Sidhu that since the events of 9/11, OFAC was keeping people from transferring money out of Pakistan and other countries. Because ZAFAR's father was the #2 guy in the political party, the Pakistani Government placed ZAFAR's whole family on the World Wide OFAC List.

[6]

 (g) From August 2008 – February 2009, Sidhu transferred approximately $3.8 million more to ZAFAR's Chase bank account (number XXXXX3088). ZAFAR told Sidhu he needed this money to pay for lawyer fees, bank fees, consulting fees, and payoffs to transfer the money from MCB to Sidhu's accounts in the United States. ZAFAR claimed he transferred $91 million to Sidhu but the money was stopped because ZAFAR was on the OFAC list. ZAFAR said he needed the additional funds to pay his lawyers to get the issue resolved.

 (h) Around February 2009, Sidhu asked his friends and family for money since Sidhu was out of funds. His friends agreed because they thought they would get their money back with interest within one or two weeks. ZAFAR would always explain why he needed money, how much he needed and the date by when it needed to be transferred. Between February 2009 and February 2010, Sidhu's friends and family transferred approximately $2 million to ZAFAR's Chase account, either directly or thru Sidhu.

 (i) In total, Sidhu and his friends transferred approximately $10 million to Zafar between January 2008 and February 2010.

 (j) In February 2010, ZAFAR told Sidhu that ZAFAR had sent another $50 million wire from the MCB account to Nirbo Enterprises, LLC's account at Wachovia Bank. ZAFAR said the wire never reached the Nirbo Enterprises account because Asif Ali Zardari (President of Pakistan) held it up.

 (k) As of October 5, 2010, Sidhu has not received any money from ZAFAR. Sidhu sold all of his interest in one of his businesses, Learn-It Systems, LLC, to repay his friends and family.

16. With Sidhu's consent, an IRS-CI Computer Investigative Specialist (CIS) searched Sidhu's Gmail account and provided a special agent with a file containing all the emails and attachments. The recovered emails included the following attachments:

 (a) Dated 09.02.2008 – Memo from the National Bank of Pakistan certifying that the current balance in ZAFAR's account (renamed as M/S Nirbo Enterprises) was Rupees 6,000,000,000, Eqv: USD $100 Million, signed by the Manager of Operations. This was to be used for the

[7]

overseas investments. Per Sidhu's instructions, ZAFAR changed the name on this account to Nirbo Enterprises.

(b) Statement of Nirbo Enterprises, LLC from the National Bank of Pakistan with an opening balance of Rupees 6,000,000,000 on 09/02/2008.

(c) Letter dated December 16, 2008, from Azam & Rai, Advocates and Legal Consultants (ZAFAR's attorney in Pakistan) to Megan McNelia Frantz at Silicon Bank, addressing ZAFAR's OFAC issue. The letter was not signed.

(d) Letter dated August 24, 2009, from Chaudhry Mukhtar, Pakistan's Minister of Defence, to Patwinder Sidhu/Veer Investments. The unsigned letter appears on letterhead for the Ministry of Defense Pakistan.

(e) Letter dated September 8, 2009, from Chaudhry Mukhtar, Pakistan's Minister of Defence, to Patwinder Sidhu/Nirbo Enterprises, LLC. The letter was drafted on Ministry of Defence Pakistan letter head and signed.

(f) Wire Transfer Request Information Form from MCB, dated 2/21/2010, for $50,000,000. (Note: Sidhu claimed he and his friends called to verify this transfer and the representative at MCB stated the account number was false.)

17. The recovered emails came from Verizon Wireless Blackberry (#786-282-0444), and/or the following email accounts: hzafar@tmail.com, hzafar@me.com, hzafar10@gmail.com, and hzafar@att.blackberry.net. Ameet Johal (a friend of Sidhu that transferred money to ZAFAR directly and through Sidhu) identified Blackberry #786-282-0444 as Zafar's number. Johal claims he spoke to ZAFAR and sent text messages to him at this number. Joseph Pilatich also provided the same cell phone number to a special agent.

18. A special agent interviewed Joseph Pilatich, Sidhu's friend on October 7, 2010. A special agent also spoke with Special Agent Raymond Nafey of the New York FBI office on October 18, 2010. Pilatich and Nafey advised that Pilatich and others complained to the New York FBI office in March 2010 regarding their loans to Sidhu. The FBI researched bank reports issued on ZAFAR and Sidhu and traced the transfers between ZAFAR and Sidhu but found no evidence of any transfers of funds between the Chase bank accounts under ZAFAR's control in Columbus, Ohio and ZAFAR's bank accounts in Pakistan for

[8]

the period of 2008 – February 2010. The FBI also discovered that ZAFAR's cell phone was being "pinged" off of cell phone towers in Miami, Florida and in Ohio. (Note: Pilatich and Sidhu advised a special agent that ZAFAR told them he is based in Pakistan and occasionally travels to the United States. Whenever ZAFAR called, his number came up as private. When they questioned ZAFAR about his phone number, ZAFAR claimed he was using the phone of a friend who lived in the United States.)

19. On the letter dated August 24, 2009 from the Ministry of Defence, the following discrepancies were identified:

    (a) "Defense" is spelled with an "s" as opposed to a "c" as in the main header.

    (b) The letter is unsigned.

    (c) Internet research was conducted by a special agent on the address listed on the letter. The letter states the address as "Chaudry Mukhtar, Minister of Defence, Islamic Republic of Pakistan, 55 Block C, Pak. Secretariat, Islamabad, Pakistan." Per yellow pages of Pakistan, The Ministry of Defence has an address of: Defence Division of Pak, Secretariat-11, Rawalpindi.

        i. The address of 55 Block C comes up under the Ministry of Health per the yellow pages of Pakistan.

20. On the letter dated September 8, 2009 from the Ministry of Defence, the following discrepancies were identified:

    (a) "Defence" is spelled as "Defense" within the body of the letter.

    (b) The letter is signed and appears to be the same style of signature used by ZAFAR. This is based by looking at ZAFAR's signature on checks and travel documents. No handwriting exemplar has been completed.

    (c) Internet research was conducted by a special agent on the address listed on the letter. The letter states the address as "Chaudry Mukhtar, Minister of Defence, Islamic Republic of Pakistan, 55 Block C, Pak. Secretariat, Islamabad, Pakistan." Per yellow pages of Pakistan, The Ministry of Defence has an address of: Defence Division of Pak, Secretariat-11, Rawalpindi.

[9]

   i. The address of 55 Block C comes up under the Ministry of Health per the yellow pages of Pakistan.

(d) No address is used for Nirbo Enterprises, LLC. In the letter dated August 24, 2009, referenced in 18 (d), a company address followed the company the letter was addressed to.

## B. ASSET, BUSINESS AND TAX INFORMATION:

21. Information obtained from the Ohio Bureau of Motor Vehicles indicates that ZAFAR purchased and subsequently sold/transferred the following vehicles during the period 2006 thru 2009:

| Date | Purchase Price | Make | Year | Seller | Buyer |
|---|---|---|---|---|---|
| 06/13/2009* | $139,423 | Aston | 2009 | Midwestern Auto Group | Midwestern Auto Group |
| 07/13/2009** | $254,250 | Lamborghini | 2010 | Midwestern Auto Group | Midwestern Auto Group |
| 01/31/2008*** | $87,007 | Mercedes S5A | 2007 | Mercedes Benz of Easton | Mercedes Benz of Easton |

*Title transferred on 02/09/2010 back to Midwestern Auto Group  No lien documented.
**Title transferred on 09/01/2009 back to Midwestern Auto Group  No lien documented.
***Title transferred on 10/22/09 back to Mercedes Benz of Easton.  ZAFAR financed the purchase through Wells Fargo.

22. Ohio BMV records indicate ZAFAR purchased the following vehicles with a lien being documented on their titles:

| Date | Purchase Price | Make | Year | Seller |
|---|---|---|---|---|
| 10/20/2010** | $16,495 | Cadillac | 2003 | Mercedes-Benz |
| 08/29/2009* | $82,909 | Rolls | 2009 | Midwestern Auto Group |
| 11/29/2006* | $22,826 | Lexus | 2004 | Lindsay Acura |
| 02/02/2005* | $30,019 | Chevrolet | 2003 | Chesrown Pontiac |

*The Ohio BMV records indicate these vehicles have *active* registrations.
**The vehicle was purchased by ZAFAR, financed through Wells Fargo Auto Finance.

23. Ohio BMV records indicate that Ohio license plate number HZ 04 was registered to a 2010 Black Lamborghini, registered to ZAFAR. However, this plate was observed by law enforcement officers on two different Mercedes Benz vehicles registered to ZAFAR.

24. Ohio Secretary of State records indicate that ZAFAR owns the following businesses:

   (a) HZ Investments LLC d/b/a Voodoo Denim Lounge

   (b) R Sourcing LLC f/k/a Rafia & Rafee Enterprises, LLC

   (c) Rafee Investments LLC

   (d) Team 10 Music Group, LLC

25. Tax records indicate that ZAFAR is/has been married to Cynthia King-ZAFAR (Cynthia) since at least 2006. Cynthia filed returns using the married filing separate filing status and included ZAFAR's SSN to identify her spouse for tax years 2006-2008. As detailed in the paragraphs below, neither Cynthia nor ZAFAR have reported sufficient income to account for their lifestyle.

26. According to IRS records, no personal tax returns were filed in Zafar's name for tax years 2006 or 2007 by their respective statutory due dates of April 15, 2007 and April 15, 2008. ZAFAR did not request any extensions of time to file his tax year 2006 return. On or before April 15, 2008, ZAFAR did request and receive extensions to file his 2007 return on or before October 15, 2008. The IRS received both the 2006 and 2007 FORMS 1040, US Individual Income Tax Returns on November 27, 2009 and processed them on December 28, 2009.

27. IRS records indicate that ZAFAR submitted a $20,011 payment with the tax year 2007 extension request. The IRS had no record of any balance due on ZAFAR's tax account at that time. The IRS subsequently refunded this payment, less a $5,636.03 offset to another government agency, on 12/28/09.

28. In November 2009, the IRS received Forms 1040, personal federal income tax returns, in the name of Haider ZAFAR for both tax years 2006 and 2007. Both returns were "zero returns." This means every line item on the returns was filled in with a "$0". Accordingly, the ZAFAR did not report any income or tax due.

29. According to IRS records, ZAFAR requested and received an extension of time to file his tax year 2008 return by October 15, 2009. ZAFAR timely requested and received an extension of time to file his tax year 2009 return on or before October 15, 2010. As of November 29, 2010, there is no record of either a 2008 or 2009 return being filed in ZAFAR's name.

30. In sum, IRS records reflect the following tax information for Haider ZAFAR:

| Tax Years | Wages | Total Adjusted Gross Income | Total Taxable Income | Date Filed |
|---|---|---|---|---|
| 2009* | $0 | $0 | $0 | DID NOT FILE |
| 2008* | $0 | $0 | $0 | DID NOT FILE |
| 2007 | $0 | $0 | $0 | 11/27/09 |
| 2006 | $0 | $0 | $0 | 11/27/09 |

*as of 11/29/10, these returns are not on file.

[11]

31. ZAFAR received over $10 million in deposits to bank accounts under his control between 2008 and 2010. ZAFAR did not report any income from these deposits. A review of Johnson's tax returns suggests that JOHNSON did not report income from these deposits either.

32. HZ Investments was formed in early 2010. That company has filed Forms 941, Employer's Quarterly Federal Tax Returns, for the first two quarters of 2010. ZAFAR has a 25% interest in the business.

33. R Sourcing LLC f/k/a Rafia & Rafee Enterprises, LLC was formed in November of 2009. The IRS has no record of any returns being filed by or on behalf of this entity to date.

34. Rafee Investments LLC was formed in May of 2009. The IRS has no record of any returns being filed by or on behalf of this entity to date.

35. Team 10 Music Group LLC was formed in October of 2008. The IRS has no record of any returns being filed by or on behalf of this entity to date.

C. OTHER INCOME/LIFESTYLE INFORMATION:

36. On an indirect loan application with Mercedes-Benz of Columbus in October 20, 2010, for a 2003 Cadillac Escalade, ZAFAR listed the following information:

    (a) Present address of Dublin, OH.

    (b) Telephone Number: (786) 282-0444.

    (c) Mortgage holder of his residence in Dublin, OH is through Wells Fargo, with payments of $1,500 per month.

    (d) ZAFAR's employer is Fr Textile, located in Delaware, OH. His occupation is "sales" and he has been at that job for 5 years and 2 months.

    (e) ZAFAR's gross monthly salary is $43,416.

37. According to IRS-CID special agents in Miami, Florida, ZAFAR traveled at different times throughout the year down to South Beach. In August 2008, Florida IRS-CI agents met with ZAFAR for a proffer session on a Haitian drug case. ZAFAR was known to run around with this type of crowd in South Beach. ZAFAR was used as a rebuttal witness for the government against a Haitian drug trafficker. None of ZAFAR's finances were addressed in this proffer session. These

Haitians would refer to ZAFAR as the "Prince of Dubai" as ZAFAR was always throwing money around down in South Beach. In October 2008, DEA agents observed ZAFAR in the South Beach, Florida area driving expensive cars and spending lavish amounts of money.

38. Local authorities conducted surveillance on ZAFAR in Delaware County, Ohio from late 2008 – early 2009. ZAFAR was observed driving expensive vehicles, and on one occasion, entering a private jet.

## D. ADDITIONAL INFORMATION SINCE JANUARY 2013

39. Since at least January 2013, ZAFAR has resided primarily in the greater Miami, Florida area and he regularly travels to Central Ohio; presumably to see his son who lives with ZAFAR'S estranged wife.

40. In March 2013, your Affiant spoke with Alex J. Alfano (Alfano) who is an attorney located in the Miami, Florida area. Bank records showed that Alfano had recently transferred hundreds of thousands of dollars into an account titled to ZAFAR. Alfono stated he was an 'escrow agent' for monies that were loaned to ZAFAR from at least one person located in South Florida who Alfono described as a well known "personality" in the area. ZAFAR told Alfono that he was from a wealthy family in Pakistan but they were not able to send him any money due to the investigation being conducted by the Internal Revenue Service – Criminal Investigation Division (IRS-CID). Furthermore, ZAFAR told Alfono that the IRS-CID had frozen all of his assets and seized his bank accounts. (NOTE: In approximately January 2011, IRS-CID executed seizure warrants for jewelry. There were no bank accounts frozen or seized.)

41. In May 2013, your Affiant spoke with a Federal law enforcement officer (FLEO) in the Miami, Florida area that was familiar with the source of the funds for which Alfono is the escrow agent. According to the FLEO, ZAFAR told a wealthy Broward County resident that he is from a wealthy family in Pakistan but he was unable to receive money from them due to him, ZAFAR, being incorrectly put on the OFAC list. ZAFAR told this person that he has approximately $40 million in a Swiss bank account in that he would be willing to invest this money into one or more of the person's businesses. In exchange, ZAFAR requested the person to loan him approximately $2 million while he worked through the process of being removed from OFAC's list. At some point in March 2013, ZAFAR signed an unsecured promissory note for $2 million dollars which is due in approximately 24 months (March 2015).

[13]

42. On the morning of May 23, 2013 Assistant United States Attorney (AUSA) Dale Williams transmitted a draft of a plea agreement to Michael Crites (Crites), who was then ZAFAR'S criminal defense attorney. Crites previously told AUSA Williams that he was meeting with ZAFAR at some point during the afternoon of May 23, 2013 and that he wanted to be able to present a draft plea agreement to his client, ZAFAR, so he would understand what his exposure was in the ongoing criminal investigation. (NOTE: per the Sentencing Guidelines calculation contained in the draft plea agreement, ZAFAR could be sentenced to a term of imprisonment if found guilty.) It is unknown to your Affiant as to whether or not Crites and ZAFAR met on the afternoon of May 23, 2013.

43. On May 24, 2013 the FLEO located in the Miami, Florida was told by a credible source of information that ZAFAR, a citizen of Pakistan, had picked up, or caused it to be picked up, his Pakistani passport from the Florida State Attorney's Office. ZAFAR'S passport was being held by the Florida State Attorney's Office due to him being a person of interest in an attempted homicide investigation. Ultimately, your Affiant believes that ZAFAR was cleared of any wrong doing. Also, this FLEO learned from the same source of information that ZAFAR was overheard arguing with a person described as his bodyguard as to which vehicle he, ZAFAR, was going to "pack up" and take to Ohio.

44. On May 26, 2013 at approximately 3:30 am, ZAFAR rented a hotel room at the Holiday Inn Express & Suites located at 8670 Orion Place, Columbus, Ohio. ZAFAR is scheduled to check out on May 29, 2013. Your Affiant saw a black Bentley convertible in the hotel's parking lot which bears a Florida license plate (BVP T93). This vehicle is registered Benjamin Bermudez who reportedly works for a luxury vehicle sales company in South Florida. Although the hotel regularly registers its guest's vehicles, this was not done when ZAFAR checked in.

[14]

## IV. CONCLUSION

45. Based on the foregoing, the Affiant believes there is probable cause to issue a criminal complaint to charge HARIDER ZAFAR with the offense of wire fraud (18 USC 1343), that the Court approves the Complaint as submitted. The Affiant further request based upon a concern that HZ may flee the United States based on recent events, that the court issues an Arrest Warrant for him. Wherefore, I request that a warrant be issued to me, pursuant to Rule 4 of the Federal Rules of Criminal Procedures, to arrest Haider ZAFAR.

Charles T. Birch
Special Agent, IRS-CI

Subscribed and sworn to before me

This __30th__ day of __May__, __2013__.

**Terence P. Kemp**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

[15]